**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCI ILLINOIS SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN T. COLI, SR., WILLIAM COLI, JOHN | ) | Case No.: 1:11-cv-07762 |
| T. COLI, JR., and TEAMSTERS LOCAL 727, | ) | |
| | ) | Judge James B. Zagel |
| Defendants. | ) | |

**DEFENDANTS' ANSWSER TO COMPLAINT**

Defendants, John T. Coli, Sr., William Coli, John T. Coli, Jr., and Teamsters local 727,

by and through their attorneys, Marvin Gittler and Heidi B. Parker, of Asher, Gittler and D'Alba,

Ltd., in answer to Plaintiff's Complaint, state as follows:

**INTRODUCTORY STATEMENT**

1.     Plaintiff brings this complaint for permanent injunctive relief and to recover

damages sustained as a result of an extortionate, fraudulent scheme perpetrated by Defendants

over a number of years.

**ANSWER:     Defendants deny any act or omission warranting the relief or damages
alleged and deny the allegations contained in Paragraph 1.**

2.     The scheme, which dates back to 2002 and is continuing, relates to fraudulently

inflated audits of Plaintiffs funeral homes and repeated improper demands for contributions to

union health, pension and education funds.

**ANSWER:     Defendants deny the allegations contained in Paragraph 2.**

3.     The scheme includes, but is not limited to, the following acts: (1) including in

fund audits claims that had previously been settled and for which signed settlement agreements

exist; (2) including in audits claims on behalf of employees who were not even in the union or

doing bargaining unit work during the time periods in question; (3) including claims against a business relating to a time period before the business even existed; (4) conspiring to purposely avoid correcting and refusing to correct known errors in the funds' audits; (5) acting in bad faith by making irrelevant and burdensome informational requests for the sole purpose of harassing Plaintiff and forcing it to spend considerable time, effort and money so that payment of the bogus and fraudulent claims would be less expensive than continuing to fight; and (6) purposely delaying and avoiding efforts to resolve any discrepancies in the audits so that above-market interest rates and penalties would accrue for as long as possible, thereby bringing additional financial pressure to bear and procuring greater amounts of revenue to the funds.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 3.**

4.      Recently, when Plaintiff determined to fully exercise its legal rights and no longer submit to Defendants' extortion and fraud, Defendants broadened the scheme to include witness tampering and obstruction of justice by, among other things, maliciously vandalizing three of Plaintiffs funeral home buildings.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 4.**

**THE PARTIES**

5.      Plaintiff, SCI Illinois Services, Inc., is an Illinois corporation having a principal place of business located at 5303 N. Western Avenue, Chicago, IL 60625.

**ANSWER:**     **Defendants admit the allegations contained in Paragraph 5.**

6.      Defendant, John T. Coli, Sr. ("John Coli, Sr." or "Coli Sr."), is an individual with a place of business at 1300 W. Higgins Road, Suite 111, Park Ridge, IL 60668. Coli Sr. is the Secretary and Treasurer of Teamsters Local 727 ("Local 727" or "the Union"). Coli Sr. is also (i) a trustee of Teamsters Local Union No. 727 Health and Welfare Fund, (ii) a trustee of Teamsters

Local Union No. 727 Pension Fund and (iii) a trustee of Teamsters Local Union No. 727 Legal and Educational Assistance Fund (together "the Local 727 Funds" or "the Funds").

**ANSWER:**    **Defendants admit the allegations contained in Paragraph 6.**

7.    Defendant, William Coli ("Bill Coli"), is an individual with a place of business at 1300 W. Higgins Road, Suite 111, Park Ridge, IL 60668. Bill Coli is the Recording Secretary for Local 727, the Fund Administrator for the Local 727 Funds and John Coli Sr.'s brother.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 7.**

8.    Defendant, John T. Coli, Jr. ("John Coli, Jr. or "Coli Jr."), is an individual with a place of business at 1300 W. Higgins Road, Suite 111, Park Ridge, IL 60668. Coli Jr., the son of Coli Sr., is the President of Local 727 and, like his father, is a trustee of each of the Local 727 Funds. Prior to John Coli, Jr. serving as President of Local 727, his uncle, Michael Coli, was the President of the Union. Collectively, Coli Sr., Coli Jr. and Bill Coli are referred to as the "Coli Defendants."

**ANSWER:**    **Defendants admit that prior to John Coli, Jr. serving as President of the Union, Zeberdee Barnes was the President of Local 727 and admit the remaining allegations contained in Paragraph 8.**

9.    Defendant, Teamsters Local 727, is a local chapter of the International Brotherhood of Teamsters, a labor union representing employees throughout the United States and Canada, having a principal place of business located at 1300 W. Higgins Road, Suite 111, Park Ridge, IL 60668.

**ANSWER:**    **Defendants admit the allegations contained in Paragraph 9.**

10.    Defendants John and Jane Does 1 through 100 are individuals whose names and addresses of residences are unknown.

**ANSWER:** **The allegations contained in Paragraph 10 have been dismissed by this Court and are denied.**

11.     Defendants John Doe Corporations 1 through 10 are corporations, the names and addresses of residences of which are unknown.

**ANSWER:** **The allegations contained in Paragraph 11 have been dismissed by this Court and are denied.**

12.     Defendants Other John Doe Entities 1 through 10 are other legal entities, the names and addresses of residences of which are unknown.

**ANSWER:** **The allegations contained in Paragraph 12 have been dismissed by this Court and are denied.**

13.     At all times relevant hereto, Defendants John and Jane Does 1 through 100, John Doe Corporations 1 through 10 and Other John Doe Entities 1 through 10 (collectively, the "John Doe Defendants") were associated with and/or controlled by the Coli Defendants and/or the Union, and are reasonably on notice of this complaint.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 13.**

14.     The Coli Defendants, in concert with each other, the Defendant Union and the John Doe Defendants, have conducted the affairs of the Local 727 Funds through a scheme to defraud and extort Plaintiff by intentionally and falsely inflating audit findings of amounts allegedly owed to the Funds and using violence as well as other forms of extortion and pressure when Plaintiff chose to resist rather than submit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 14.**

15.     The Coli Defendants control Teamsters Local 727 and have and continue to maintain control of Local 727 by installing relatives and allies in positions of power. Defendant

Coli Sr.'s brothers, James L. Coli and Michael Coli, along with their father, James E. Coli, all have previously served in powerful leadership roles in the Union. This arrangement has allowed and continues to allow the Coli Defendants to control and protect employment and compensation security for themselves, their relatives and their allies.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 15.**

16. Of the four union-side Trustees of the Local 727 Funds, three are members of Defendant Coli Sr.'s immediate family, including himself, and his two sons, Defendant John Coli, Jr. and Joseph Coli. Additionally, Coli Sr.'s brother, Bill Coli, serves as the Fund Administrator and exercises control over the Funds' audit process.

**ANSWER:** **Defendants admit that John Coli, Sr., John Coli, Jr., and Joseph Coli are union-side Trustees of the Funds but deny the remaining allegations contained in Paragraph 16.**

17. The Coli Defendants, by dominating the Union with relatives and allies, have inherent conflicts of interest and self-dealing opportunities to the detriment of Union members as well as employers whose employees are represented by the Union.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 17.**

18. By engaging in the scheme to extort contributions from Plaintiff into the Funds, the Coli Defendants are seeking to increase the viability and perceived financial soundness of the Funds by any, including illegal means.

**ANSWER: Defendants deny the allegations contained in Paragraph 18.**

19. By engaging in the scheme to extort contributions from Plaintiff into the Funds, the Coli Defendants and the Union are seeking to serve and protect their own direct and indirect financial interests. The Union's pension fund is seriously underfunded and a source of potential embarrassment and criticism for the Union and its leadership. The underfunded status of the

Funds impacts the Union's ability to recruit and retain members, which has the effect of diminishing membership dues, the primary revenue source for the Union. The Coli Defendants and the Union are therefore seeking to augment the pension fund by engaging in this fraudulent and extortionate scheme to reduce the level of underfunding. The seriously underfunded status of the pension fund is also a potential source of embarrassment for and criticism of the Coli Defendants, causing their job performance to be called into question, and raising questions about their competence and issues of nepotism, cronyism, qualifications, experience and general fitness to carry out their responsibilities, placing at risk their job security and generous compensation packages. Similar motives exist with regard to the other union benefit plans. The Coli Defendants are engaging in this scheme to wrongfully extort money that the Funds are not entitled to for the purpose of improving their image, consolidating their control and thereby protecting their own financial interests and maintaining control of the Funds and the Union.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 19.**

## JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331 and 1337.

**ANSWER:** **Defendants admit Plaintiff's action was brought pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331 and 1337 but deny jurisdiction as alleged in Paragraph 20.**

21. Venue is properly placed in this district pursuant to 28 U.S.C. § 1391(a) and 18 U.S.C. § 1964(c), as the events which give rise to the claims asserted occurred within this district.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 21.**

## THE DEFENDANTS' SCHEME

22.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), and the Plaintiffs collective bargaining agreement with the Union, Plaintiff is required to pay into the Funds certain amounts for each eligible employee. An audit process set forth in the Funds' Statement of Audit Procedures is intended to provide a legitimate means by which an accurate determination can be made as to whether the required amounts have been contributed.

**ANSWER:**      **Defendants admit the allegations contained in Paragraph 22.**

23.      Defendants have perverted this legitimate process into a scheme to defraud Plaintiff. For years, Defendants having falsified audit reports and demanded amounts well in excess of what was legitimately owed. Defendants have pummeled Plaintiff into submission and extorted greater amounts than Plaintiff was required to pay by using threatened and actual litigation which was in great part meritless. Defendants, in concert with one another and by controlling the Funds' management, used ERISA, the collective bargaining agreement and the courts as a bludgeon.

**ANSWER:**      **Defendants deny the allegations contained in Paragraph 23.**

24.      Defendants have conspired to and have falsely and intentionally inflated audits relating to how much was owed to the Local 727 Funds, continually abusing the legitimate audit process year after year to extort as much money as possible from Plaintiff for the Funds.

**ANSWER:**      **Defendants deny the allegations contained in Paragraph 24.**

25.      Finally, after years of Plaintiff submitting to extortion and incurring enormous legal expenses, Plaintiff decided to fight instead. In litigation brought by the Funds at the control and direction of the Defendants, Plaintiff sought the deposition of key individuals, including

Defendant John Coli, Sr. Coli Sr. resisted his deposition vigorously. When the court finally ordered him to attend he did appear, but was belligerent and uncooperative, stating, "For the record, go fuck yourself."

**ANSWER:** **Defendants deny they engaged in extortion. Further, the Defendants deny that Defendant, John Coli, Sr. resisted his deposition and admit that Defendant John Coli, Sr., referring to counsel's arrogance and insinuations during his deposition, stated, "For the record, go fuck yourself."**

26. Notwithstanding the Court's instruction that Coli Sr. make himself available for a full day of deposition testimony, he unilaterally left the deposition after a short time claiming that the Mayor of Chicago, Rahm Emanuel, needed him on an emergency basis. Coli Sr. was using his relationship with the Mayor as a justification for violating with impunity the court order requiring him to testify. Plaintiff also believes that Coli Sr. was using his relationship with Mayor Emanuel as a political threat to Plaintiff. Plaintiff has significant and ongoing dealings with city and state authorities based in Chicago. Plaintiff believes that Coli Sr.'s mention of the Mayor's name in the context of leaving a court-ordered deposition was a statement that Coli Sr. is very close with the Mayor and could cause harm to Plaintiff's economic interests by interfering with Plaintiffs legitimate need for interacting with local regulatory agencies. Discovery will reveal if there even was a meeting with the Mayor at that time, how long this meeting actually lasted, and whether Coli Sr.'s. attendance at that specific time was urgent.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 26.**

27. Following Coli Sr.'s decision to leave the court-ordered deposition, he refused to return to complete his testimony. Plaintiff was forced to seek court intervention for a second time, and Coli Sr. was again ordered by the Court to appear to complete his deposition.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 27.**

28.     At a status conference held after the deposition session where Coli Sr. abruptly left, Coli Sr.'s attorney, Robert B. Greenberg ("Attorney Greenberg"), conveyed Coli Sr.'s displeasure at being deposed and being asked questions Coli Sr. found harassing and irrelevant. Plaintiff refused to be intimidated and continued to depose Coli Sr.

**<u>ANSWER:</u>     Defendants deny the allegations contained in Paragraph 28.**

29.     Shortly after the second session of Coli Sr.'s deposition, Defendants vandalized multiple businesses owned by Plaintiff with the intention of obstructing justice. Defendants intended to intimidate and corruptly deter Plaintiff from calling Coli Sr. as a witness at trial in furtherance of Defendants' effort to frighten and force Plaintiff to continue to submit as Plaintiff had in the past.

**<u>ANSWER:</u>     Defendants deny the allegations contained in Paragraph 29.**

30.     Defendants' scheme, used repeatedly to defraud Plaintiff, involves the following methods: (1) artificially inflating the amounts alleged to be due and owing to the Funds through the use of fraudulent and misleading audits; (2) including individuals in audits for whom Plaintiff does not owe contributions and/or for whom Plaintiff had already made contributions; (3) alleging deficiencies against businesses included in audits when Plaintiff did not owe contributions for such businesses; (4) including individuals and locations in audits that are known to be subject to prior settlement agreements; (5) including artificially inflated amounts within audits relating to livery removals and trips; (6) using litigation and the threat of steadily increasing interest and penalties on allegedly delinquent contributions as a sword to force Plaintiff to settle disputed claims and pay amounts not owed; and (7) property destruction as a threat to Plaintiff so that Plaintiff would simply submit and pay amounts not owed as well as exorbitant interest and penalties on such amounts.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 30.**

31.     Defendants conceived and have carried out the scheme to defraud and extort Plaintiff over a period of many years with the intent of fraudulently increasing the value of the Funds, enriching the Defendants and increasing the Coli Defendants' power within Local 727.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 31.**

32.     The Defendants commenced the scheme to defraud Plaintiff in 2002 and it continues through to the present day.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 32.**

33.     The Coli Defendants have threatened Plaintiff that additional audits will be forthcoming, thereby indicating that the scheme to defraud and extort will continue into the future.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 33.**

34.     By increasing the size of the Local 727 Funds, the Coli Defendants increase their political power and control over the Union and have greater job security for themselves, their relatives and allies as a result of: (1) the Union's significantly underfunded pension plan becoming more economically viable, thereby reducing the likelihood of embarrassment to and criticism of the Coli Defendants relating to the status of the pension plan; and (2) the Union's ability to attract new members and fill its coffers with additional membership dues.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 34.**

35.     The scheme to defraud Plaintiff involves similar transactions, enterprises, victims, predicate acts and other characteristics.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 35.**

36.     The Defendants have repeatedly employed the U.S. mails and wires in furtherance of the scheme to defraud Plaintiff.

**ANSWER:     Defendants deny the allegations contained in Paragraph 36.**

37.     The Defendants have engaged in witness tampering, obstruction of justice and unlawful influence regarding the operations of an employee benefit plan in furtherance of the scheme to defraud Plaintiff.

**ANSWER:     Defendants deny the allegations contained in Paragraph 37.**

38.     The Defendants have violated federal racketeering laws in the course of the scheme to defraud and extort Plaintiff, and Plaintiff has been directly harmed as a result of such violations.

**ANSWER:     Defendants deny the allegations contained in Paragraph 38.**

39.     The Defendants conspired with each other and, in concert, engaged in the scheme to defraud and extort Plaintiff.

**ANSWER:     Defendants deny the allegations contained in Paragraph 39.**

40.     Each of the Defendants, upon joining the conspiracy, ratified the acts in furtherance thereof and previously committed.

**ANSWER:     Defendants deny the allegations contained in Paragraph 40.**

41.     The act of each of the Defendants is the act of each of the other Defendants.

**ANSWER:     Defendants deny the allegations contained in Paragraph 41.**

42.     The acts of the Coli Defendants were the acts of the Defendant Union as agents of the Union.

**ANSWER:     Defendants deny the allegations contained in Paragraph 42.**

43.     The acts of the Coli Defendants were the acts of the Defendant Union as the Coli Defendants control the Union.

**ANSWER:     Defendants deny the allegations contained in Paragraph 43.**

44.     The acts of all Defendants were the acts of the Defendant Union as agents of the Union.

**ANSWER:     Defendants deny the allegations contained in Paragraph 44.**

45.     The acts of Defendant Bill Coli as Fund Administrator were ratified and approved by the other Defendants.

**ANSWER:     Defendants deny the allegations contained in Paragraph 45.**

46.     Defendant Bill Coli, in furthering the conspiracy between the Defendants, was acting as the agent of the other Defendants.

**ANSWER:     Defendants deny the allegations contained in Paragraph 46.**

<strong>The Audit Process</strong>

47.     Local 727 and Plaintiff were parties to a five-year collective bargaining agreement ("CBA") commencing July 1, 2002 and ending June 30, 2007.

**ANSWER:     Defendants admit the allegations contained in Paragraph 47.**

48.     Local 727 and Plaintiff have since been parties to two successor collective bargaining agreements, the first covering July 1, 2007 through June 30, 2010 and the second covering July 1, 2010 through June 30, 2013.

**ANSWER:     Defendants admit the allegations contained in Paragraph 48.**

49.     The CBA covers auto livery chauffeurs, funeral directors and embalmers, as well as funeral director and embalmer trainees.

**ANSWER:     Defendants admit the allegations contained in Paragraph 49.**

50. Under the CBA, Plaintiff is required to fund delineated contributions to the Funds on account of eligible employees covered by the CBA.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 50.**

51. Plaintiff is exempt from making contributions on behalf of certain employees under the CBA. Pursuant to section 9.5, Plaintiff may be exempted from making contributions to the Funds for individuals employed as district managers, regional managers or area managers by virtue of a mutual agreement between the employee and Plaintiff following notification to the Funds of the employee's benefit package.

**ANSWER:** **Defendants admit that certain employees may be exempt from provisions of the CBA but deny the remaining allegations contained in Paragraph 51.**

### The Bansley & Kiener Audit

52. Five days after the expiration of the CBA, Defendants directed Bansley & Kiener, L.L.P. ("B&K"), a certified public accounting firm with no prior history of performing payroll audits relating to funeral homes, to perform a field payroll audit of Plaintiff for the period covered by the CBA (the "B&K audit").

**ANSWER:** **Defendants deny the allegations contained in Paragraph 52.**

53. Prior to the B&K audit, the Funds had regularly retained Legacy Professionals LLP ("Legacy") and Thomas Havey LLP ("Thomas Havey") to perform payroll audits of contributing employers in the funeral home industry on a location-by-location basis.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 53.**

54. The B&K audit was the first "employer-wide" audit that covered all funeral homes owned by Plaintiff in the State of Illinois.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 54.**

55.     The entire audit procedure was monitored and controlled by Defendant Bill Coli in his capacity as Fund Administrator. All actions and omissions by Defendant Bill Coli were approved, agreed to and/or ratified by Defendants Coli Sr. and Coli Jr.

**ANSWER:     Defendants deny the allegations contained in Paragraph 55.**

56.     The status of the audit procedure was regularly reported to the Board of Trustees for the Funds, including, to Defendants John Coli, Sr. and John Coli, Jr.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 56 and deny said allegations.**

57.     On July 12, 2007, B&K sent a letter to Plaintiff wherein B&K advised Plaintiff that it had been selected for a field payroll audit to be conducted on behalf of the Board of Trustees of the Funds. The stated purpose of the audit was "to determine [Plaintiffs] compliance with its obligation under the fringe benefit provisions of [the CBA] with Local 727."

**ANSWER:     Defendants admit the allegations contained in Paragraph 57.**

58.     Pursuant to the Fund's Statement of Audit Procedures, upon Plaintiff's selection as an audit target, the Fund Office opened an audit file "to compile information and to monitor the status of the audit."

**ANSWER:     Defendants admit the allegations contained in Paragraph 58.**

59.     The Funds were also required to send any Fund records necessary to the auditor, including checking employer information sheets on file to determine if previous contact with the employer was made, employer contribution information and copies of contracts for the audit period.

**ANSWER:     Defendants admit the allegations contained in Paragraph 59.**

60.     The Defendants intentionally failed to send necessary records to B&K, including, inter alia, prior settlement agreements between Plaintiff and the Funds and prior audit results.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 60.**

61. The Defendants withheld the records as the first step in seeking to extort money from Plaintiff by (1) having B&K issue a report that artificially inflated the scope and size of the audit and the amount of purported delinquent contributions owed by Plaintiff, and (2) having the Board of Trustees institute litigation based upon the intentionally erroneous audit report, so as to (3) strong-arm Plaintiff into paying amounts not owed, together with interest and penalties based on the underlying inaccurate assessments.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 61.**

62. After receiving the July 12, 2007 letter, Plaintiff cooperated with B&K by regularly meeting with B&K representatives and providing thorough and detailed payroll records, job descriptions, livery logs and information relating to Plaintiffs employees.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 62.**

63. In or around March 2008, B&K provided Plaintiff with a list of exceptions of individuals for whom B&K claimed it needed additional information for purposes of completing the audit.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 63 and deny said allegations.**

64. Specifically, B&K claimed that the job descriptions provided by Plaintiff were not specific enough and that B&K needed more detailed descriptions for each and every one of Plaintiff's employees. The Defendants' purpose in causing B&K to seek more detailed job descriptions was to harass Plaintiff and make the process as expensive as possible so that Plaintiff would pay amounts it did not owe.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations that B&K claimed that the job descriptions provided by Plaintiff were not specific enough and that B&K needed more detailed descriptions for each and**

every one of Plaintiffs employees and therefore deny those allegations. **Defendants deny the remaining allegations contained in Paragraph 64.**

65.     The additional information that B&K claimed it needed was not actually necessary for purposes of completing the audit, but was requested at the direction of the Defendants as a pretext for not removing the artificially-inflated numbers in the B&K audit report.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegation that the additional information that B&K claimed it needed was not actually necessary for purposes of completing the audit and deny that it was requested at the direction of Defendants and deny the remaining allegations contained in Paragraph 65.**

66.     After its March 2008 meeting with B&K, Plaintiff began the lengthy and arduous process of compiling the additional information sought by B&K; however, B&K, at the direction of the Defendants, had no intention of waiting for the additional information before issuing its preliminary audit report.

**ANSWER:     Defendants deny the allegations contained in Paragraph 66.**

67.     On April 22, 2008, B&K prepared a preliminary report of deficiencies and issued a copy of same to Plaintiff and Defendant Bill Coli.

**ANSWER:     Defendants admit the allegations contained in Paragraph 67.**

68.     On May 5, 2008, Gary Pater ("Pater"), a partner with B&K, wrote a letter to Defendant Bill Coli claiming that B&K had not received any response from Plaintiff regarding B&K's request for additional documentation or B&K's draft of preliminary findings. Pater also requested in the May 5 letter the Funds' assistance in obtaining the remaining payroll records "necessary to complete [B&K's] audit."

**ANSWER:     Defendants admit the allegations contained in Paragraph 68.**

69.     Contrary to Mr. Pater's letter to Defendant Bill Coli, after receiving the initial draft of the audit, Plaintiff made continuous concerted efforts to work with the Funds and B&K to provide documentation needed to allow for the proper revision of the audit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 69.**

70.     Upon receiving a draft audit report, a Collection and Field Representative ("CFR") of the Funds, under the direction of Defendant Bill Coli, the Fund Administrator, is required to review the report for apparent errors and potential problems, note any issues, and communicate the results of the review to the auditor within four weeks of receiving the draft report.

**ANSWER:     Defendants deny Defendant Bill Coli is the Fund Administrator and admit the remaining allegations contained in Paragraph 70.**

71.     Ben Affetto ("Affetto") was the CFR for the Funds assigned to the B&K audit. Affetto was acting at all times under the direction and control of the Defendants.

**ANSWER:     Defendants deny the allegations contained in Paragraph 71.**

72.     Affetto is also a member of Local 727 and, along with Defendant Coli Sr., was part of the negotiating committee for the CBA.

**ANSWER:     Defendants deny the allegations contained in Paragraph 72.**

73.     Affetto, under the direction of the Coli Defendants, caused the draft audit report to have intentional misrepresentations, including, for example: individuals who were not members of Local 727 nor involved in work covered by the CBA; individuals covered by previous settlement agreements between Plaintiff and Local 727 wherein Local 727 had released Plaintiff from all benefit fund contribution obligations covering dates included within the scope of the audit; and funeral homes which had entered into settlement agreements with Local 727 wherein the Union had released Plaintiff from all benefit fund contribution obligations.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 73.**

74.    Under the direction of Defendants, the Funds intentionally failed to provide B&K with documentation and information relating to certain individuals and settlement agreements so that the audit report would show a much larger deficiency than was actually due.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 74.**

75.    Under the direction of the Defendants, the Funds intentionally failed to provide B&K with letters in the possession of the Funds and the Union that unequivocally established that a number of individuals included in the preliminary audit had withdrawn from the Union in April 2005.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 75.**

76.    Plaintiff continued to consistently provide B&K, Defendant Bill Coli and Affetto with documentation needed for the proper revision of the audit, including wage and earning information and detailed employee job descriptions requested by B&K and the Funds.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 76.**

77.    Despite Plaintiffs continued concerted efforts to provide documentation showing the errors in the audit, B&K and the Funds refused to make appropriate revisions.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 77.**

78.    On March 30, 2009, B&K sent a final audit report to the Board of Trustees for the Funds alleging more than $317,000 in deficiencies over a five year period of time and demanding payment in excess of $528,000.

**ANSWER:**    **Defendants admit the allegations contained in Paragraph 78.**

79.    The final audit report contained intentional errors and deficiencies known to the Defendants.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 79.**

80.     On April 2, 2009, Defendant Bill Coli sent the final audit report containing the fraudulent inclusions to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Bill Coli went on to state that the Fund Office must hear from Plaintiff by April 17, 2009, "in order for [Plaintiff] to avoid unnecessary expenses and litigation."

**ANSWER:     Defendants deny the allegations contained in Paragraph 80.**

81.     The Defendants knew that the audits contained false information, including erroneous penalties for employees who were neither members of Local 727 nor performing any work covered by the CBA, and intended for Plaintiff to pay sums not legally owed to the Funds in order for Plaintiff to avoid litigation expenses and penalties. The Funds, under the control of Defendants, demanded significant contributions for individuals and businesses which were exempt from contributions pursuant to settlement agreements signed by a Fund Trustee and Union official.

**ANSWER:     Defendants deny the allegations contained in Paragraph 81.**

82.     The Defendants concealed, failed to disclose and misrepresented the accuracy of the final audit report to Plaintiff and included demands in excess of $215,000 plus interest and penalties for employer contributions within the final audit report for a number of individuals and funeral homes known to have not been covered by the CBA for the period in question and to have been the subject of prior settlement agreements between Local 727 and Plaintiff. The material omissions and/or misrepresentations included, but are not limited to, the following individuals and funeral homes:

   a.   Deborah Dougherty-Dominiak, who had withdrawn from Local 727 and served as a Manager for Plaintiff;

b. Adam Pilachowski, who had withdrawn from Local 727 and whose employment dealt entirely with community relations, which is not bargaining unit work;

c. Ronald Pasco who had withdrawn from Local 727 and who managed Plaintiffs business;

d. David Klein, who had withdrawn from Local 727 and managed Plaintiffs Chicago businesses;

e. Rose Lamb, who was an Area Manager and, with the knowledge and consent of all parties, participated in the Plaintiffs benefit plans rather than those of the Union;

f. Chris Balodimas, who had withdrawn from Local 727 and served as an area manager for Plaintiff during the period of time covered by the audit;

g. Seymour Mandel, who had not worked for Plaintiff since January 2003 but was included in the audit for periods beyond the time he was no longer employed by Plaintiff;

h. Steven Parker, who had transferred from an Illinois location to a Florida location in January 2006 but was included in the audit for periods beyond the time he had transferred to Florida;

i. Michael Delegatto, Patrick Cornick and Anthony DiCanio, all of whom had entered into settlement agreements with Plaintiff and the Union, wherein the Union released Plaintiff from all benefit fund contribution obligations covering dates included in the audit; and

j. Cypress Funeral Home, Ridge Funeral Home, Kenny Brothers Funeral Home and Lloyd Mandel Levayah, all of which had entered into settlement agreements with

Local 727 wherein the Union released Plaintiff from all benefit fund contribution obligations covering dates included in the audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 82, including subparagraphs (a)-(j).**

83. Although Adam Pilachowski had been included in the preliminary audit findings, Plaintiff was advised by the Funds and B&K that Pilachowski would be removed from the audit findings based upon the fact that Plaintiff had provided proof that Pilachowski had withdrawn from Local 727 and did not perform any work covered by the CBA during the period of time covered by the audit. Pilachowski was nonetheless intentionally included in the final audit report.

**ANSWER: Defendants deny the allegations contained in Paragraph 83.**

84. On April 30, 2009, Plaintiffs Market Director, David Klein, wrote a letter to Affetto noting that the final audit included numerous erroneous delinquencies, including those alleged above.

**ANSWER: Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 84 and deny said allegations.**

85. The improper inclusion of individuals and funeral homes known by the Defendants to be beyond the scope of the audit, artificially inflated the alleged delinquencies claimed by the Fund to be due and owing by Plaintiff by hundreds of thousands of dollars.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 85.**

86. The Defendants intentionally ignored Plaintiffs complaints of improperly-included individuals and funeral homes in the audit, improperly used the penalty provisions in the CBA in a wrongful and extortionate manner and instituted audit litigation to strong-arm Plaintiff into quickly settling the wrongly asserted claims rather than incur significant expenditures to defend the action.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 86.**

87.     On June 2, 2009, Attorney Greenberg, counsel for the Funds, wrote a letter to Plaintiff requesting payment for alleged "audit delinquencies, liquidated damages, interest and auditing costs in the amount of $528,522.16." Attorney Greenberg advised that unless payment in full was received within ten days, he would institute legal action against SCI to recover the amount.

**ANSWER:     Defendants admit the allegations contained in Paragraph 87.**

88.     On June 22, 2009, at the direction of the Defendants, the Funds filed a lawsuit against Plaintiff, captioned <u>Teamsters Local Union No. 727 Health and Welfare Fund, et al. v. SCI Illinois Services. Inc. d/b/a Cypress Funeral Home</u>, Docket number 09-cv-3736, in the United States District Court for the Northern District of Illinois (the "Cypress Funeral Home Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:     Defendants deny the allegations contained in Paragraph 88.**

89.     At the time the Funds filed the Cypress Funeral Home Lawsuit, the Defendants knew that a significant percentage of the amounts sought by the B&K audit were not in fact due and owing to the Funds.

**ANSWER:     Defendants deny the allegations contained in Paragraph 89.**

90.     After the Cypress Funeral Home Lawsuit was filed, Plaintiff continued to provide B&K and the Funds with documentation establishing that the audit was materially flawed.

**ANSWER:     Defendants deny the allegations contained in Paragraph 90.**

91.     On or about August 10, 2009, David Klein wrote a letter to Bill Coli, with a copy to Coli Sr. and Affetto, wherein Plaintiff again pointed out the serious flaws and errors within the final audit and provided further documentation substantiating the numerous material errors set forth in paragraph 82, above.

**ANSWER:    Defendants deny the allegations contained in Paragraph 91.**

92.     From the time the Cypress Funeral Home Lawsuit was filed through the present date, B&K and the Funds have continued to demand that Plaintiff provide voluminous documentation in order to remove certain individuals from the audit on the pretext that the information was necessary to complete their audit, despite having not utilized the information in completing the audit originally.

**ANSWER:    Defendants deny the allegations contained in Paragraph 92.**

93.     B&K and the Funds made constantly changing, unreasonable demands for additional documentation with the intent to make the conditions for removing the individuals from the audit practically impossible, while causing Plaintiff to incur unnecessary costs and legal fees, all with the intention of making Plaintiff pay more than it owed in order to save legal fees, costs and expenses.

**ANSWER:    Defendants deny the allegations contained in Paragraph 93.**

94.     Despite the Funds' and B&K's refusal to respond to Plaintiffs repeated requests that B&K articulate the relevance of requests for documentation pertaining to businesses and employees outside of Chicago and not subject to the CBA, Plaintiff reluctantly acquiesced, providing thousands of pages of documents containing sensitive information, including salaries, for employees all across the state of Illinois. When Plaintiff asked that this sensitive information, which was not relevant to a Chicago area union audit but could be used for future union purposes, be protected with a confidentiality agreement, the Funds refused and provided no reason. Each time the Funds and B&K made a harassing request for irrelevant documentation and Plaintiff complied, there would be a new burdensome request. B&K and the Funds

constantly moved the target, repeatedly demonstrating that they had no intention of conducting the audit or the litigation in good faith.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 94.**

95. Over one year after issuing its final audit report and nearly eleven months after the Funds had commenced the Cypress Funeral Home Lawsuit, on May 12, 2010, B&K issued a revised audit removing only the individuals who had entered into settlement agreements with the Union and Plaintiff and the amounts related to Cypress Hill Funeral Home and Ridge Funeral Home as a result of their respective settlement agreements. These settlement agreements had been signed by the Funds and the Union years before, but were intentionally ignored for the purposes of this audit. Even after these dispositive documents were brought to the attention of the Funds and its auditors, they continued to ignore them while interest continued to accrue in favor of the Funds and to Plaintiffs detriment. Only nearly a year later, and shortly before a Court hearing where these settlement agreements were to be referenced, did the Funds direct B&K to remove the individuals and locations covered by the settlement agreements.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 95.**

96. During the course of the Cypress Funeral Home Lawsuit, without Plaintiffs knowledge, Fund CFR Ben Affetto located and met with Plaintiffs former employee, Chris Balodimas ("Balodimas"), regarding the lawsuit. Balodimas advised Affetto that he did not perform bargaining work during the period of time covering the audit. Despite this information, the Defendants did not remove Balodimas from the audit and intentionally failed to disclose this information to either Plaintiff or to the Court. It was only after Mr. Affetto's meeting with Balodimas and Plaintiffs own efforts to speak with Balodimas that Plaintiff learned from Balodimas that he had already informed the Funds he was not performing bargaining unit work.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 96.**

97.     The Defendants also communicated with Plaintiff's employee Rose Lamb, an individual the Funds allege accounts for tens of thousands of dollars in claimed deficiencies. The Defendants attempted to procure favorable testimony from Ms. Lamb by negotiating an arrangement on this witness's behalf that would protect her against certain personal liabilities.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 97.**

98.     In the cover letter accompanying the May 12, 2010 revised final audit, B&K again demanded additional information regarding disputed individuals who were still named in the revised audit report but were not Union members and/or who did not perform any bargaining work during the time period of the audit. The letter detailed additional information purportedly required by B&K in order to remove the individuals from the audit.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 98 and deny said allegations.**

99.     On May 14, 2010, Plaintiff notified B&K that while it was unable to provide documents with detailed job descriptions for each employee in dispute, as such documents did not exist, Plaintiff would create a document detailing each of the disputed employee's responsibilities and duties.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 99 and deny said allegations.**

100.     In furtherance of Defendants' efforts to intentionally frustrate Plaintiffs attempts to remove the improperly-included individuals from the audit, B&K responded to the May 14, 2010 letter by stating that in order to remove the seven individuals in dispute, they would need detailed job descriptions for hundreds of Plaintiffs employees across the entire state of Illinois over a five-year period. This request was made despite the fact that B&K's certified audit noted only a select number of individuals at issue for alleged deficiencies.

**ANSWER:** **Defendants deny they made efforts to frustrate Plaintiff's attempts to remove the improperly-included individuals from the audit and lack sufficient knowledge or information to enable them to admit or deny the remaining allegations contained in Paragraph 100 and deny said allegations.**

101.     Plaintiff provided B&K with detailed job descriptions for each of the seven individuals, who collectively accounted for more than $160,000 in alleged deficiencies, setting forth the scope of their employment with particularity to further establish to Defendants that the individuals were not covered by the CBA and should be removed from the audit. Plaintiff provided this information in a format specifically created by B&K. B&K's May 12, 2010 letter to Plaintiffs attorney had indicated these specific job descriptions was the only remaining information needed before removing these individuals from the audit.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 101 and deny said allegations.**

102.     Even after providing the Defendants with the detailed job descriptions in the format B&K requested, which information clearly established that the individuals in dispute were neither members of the Union nor performing bargaining unit work during the time period in question, the Defendants directed B&K to not remove the disputed individuals from the revised final audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 102.**

103.     On July 21, 2010, at the request of Defendants, Gary Pater of B&K wrote a letter to Defendant Bill Coli suggesting that B&K was unable to complete the audit because Plaintiff had failed to provide certain information.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 103.**

104.     The supposedly needed information cited in the July 21, 2010 letter from Pater to Defendant Bill Coli was in no way necessary for purposes of removing the individuals in dispute from the audit, but rather was drafted by B&K at the request of Defendants to provide cover for

Defendants' continued attempts to extort additional monies from Plaintiff on the basis of the artificially inflated audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 104.**

105.     After counsel for Plaintiff wrote to B&K on August 12, 2010 and August 27, 2010 requesting an explanation as to how B&K suddenly came to the conclusion that certain provisions of the CBA applied to the seven individuals in dispute, Pater responded via letter on September 7, 2010 refusing to change the audit unless Plaintiff could come up with "compelling documentation that would indicate [that the individuals should be removed]." The information previously provided was entirely clear on the issue, but no matter how much evidence was presented, including settlement agreements actually signed by the Funds, the Defendants instructed B&K to not accept any explanation or documentation Plaintiff provided.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 105.**

106.     Finally, only following a Court-ordered mediation with a U.S. Magistrate Judge, and after Plaintiff had expended considerable resources in litigation over approximately twenty months, did the Defendants instruct B&K to remove five of the seven disputed individuals from the intentionally inflated audit.

**ANSWER: Defendants deny the allegations contained in Paragraph 106.**

107.     On or about February 22, 2011, Attorney Greenberg sent Plaintiff a second revised final audit seeking only half of the amount the Funds had originally sought. It took over a year and a half of litigation at considerable expense to Plaintiff to get the Funds to revise the knowingly false audit. Even so, the revised audit still included alleged deficiencies in contributions for individuals for whom Plaintiff had already provided proof of payment.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 107.**

108.     On or about October 18, 2011, Attorney Greenberg sent Plaintiff a third revised final audit that still included alleged deficiencies in contributions for individuals and funeral homes for whom Plaintiff had repeatedly provided proof of payment.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 108 and deny said allegations.**

109.     The Defendants still continue to seek payment from Plaintiff on account of the fraudulent and intentionally misleading third revised final audit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 109.**

### Vandalism, Witness Intimidation and Obstruction of Justice

110.     As a result of Plaintiff's determination to no longer submit to extortion and to vigorously defend the Cypress Funeral Home Lawsuit, the Defendants have now threatened Plaintiff by destroying Plaintiff's property. In furtherance of the Defendants' unlawful scheme, they have, by virtue of damaging three of Plaintiff's funeral homes, engaged in witness tampering and obstruction of justice.

**ANSWER:     Defendants deny the allegations contained in Paragraph 110.**

111.     In the pending Cypress Funeral Home Lawsuit, Plaintiff sought to take the deposition of Defendant Coli Sr. and was ultimately forced to obtain a court order compelling his attendance. Eventually, after much time and expense, Coli Sr.'s deposition was scheduled for June 1, 2011.

**ANSWER:     The Defendants admit Plaintiff sought Defendant Coli, Sr.'s deposition to take place on June 1, 2011, and deny the remaining allegations contained in Paragraph 111.**

112.     Throughout the June 1 deposition, Coli Sr. repeatedly refused to answer questions relating to the relationship between himself, Local 727 and the Funds. He was belligerent and

uncooperative, saying at one point for the court reporter to transcribe, "For the record, go fuck yourself." See Exhibit "A" at p. 82.

**ANSWER:** **Defendants admit that Defendant Coli, Sr., referring to counsel's arrogance and insinuations, stated "For the record, go fuck yourself," and deny the remaining allegations contained in Paragraph 112.**

113.     Approximately two hours into the deposition, at 11:18 a.m., Attorney Greenberg, serving as counsel for both the Funds and Coli Sr., announced that Coli Sr. had received a call from Mayor Rahm Emanuel's office requesting Coli Sr. to appear at the Mayor's office at 1:00 p.m. Greenberg adjourned the proceedings at approximately 12:00 p.m. and represented that the deposition would recommence later that afternoon.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 113 and deny said allegations.**

114.     Coli Sr. expressly mentioned Mayor Emanuel's name so that he could leave the deposition in violation of the terms of the court order compelling his appearance. Coli Sr. also mentioned the Mayor's name as a political threat to Plaintiff knowing that Plaintiff regularly interacts with city and state officials in Chicago during the ordinary course of its business.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 114.**

115.     Coli Sr. did not return to complete his deposition. After hours elapsed following Coli Sr.'s abrupt departure, Attorney Greenberg advised counsel for Plaintiff that he had not heard from Coli Sr. regarding the meeting with Mayor Emanuel and agreed to reschedule the deposition for a later date. Discovery will reveal whether Coli Sr. actually did have a meeting with the Mayor that day and if so, how long that meeting lasted.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 115.**

116.     At a status hearing on June 7, 2011, six days after Coli Sr.'s June 1 deposition, Attorney Greenberg expressed to counsel for Plaintiff that Coli Sr. was frustrated and displeased

with the prospect of having to continue his deposition and conveyed Coli Sr.'s indignation. Coli

Sr. did not want to be a witness either at a deposition or at trial and instructed Greenberg to resist

all attempts to force Coli Sr. to complete his testimony.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 116.**

117.    Despite the message conveyed by Attorney Greenberg at the June 7 status

hearing, counsel for Plaintiff advised Greenberg that Plaintiff would continue to take Coli Sr.'s

deposition. Plaintiff refused to be intimidated. Coli Sr. again resisted being deposed and Plaintiff

was forced to obtain a second court order compelling his attendance. Eventually, on July 5, 2011,

Coli Sr. was forced to appear.

**ANSWER: Defendant Coli, Sr. admits he appeared July 5, 2011, for his deposition, denies he resisted being deposed and lacks sufficient knowledge or information to enable him to admit or deny the remaining allegations contained in Paragraph 117 and denies said allegations. The remaining Defendants lack sufficient knowledge or information to enable them to admit or deny the remaining allegations contained in Paragraph 117 and deny said allegations.**

118.    On the night of July 10, 2011, five days after Coli Sr.'s second deposition, three

funeral homes owned by Plaintiff were vandalized: (1) Weinstein Brothers Memorial Chapels;

(2) Lauterburg & Oehler; and (3) Oehler Funeral Home Ltd. Photos of obscenities scrawled on

the walls and broken windows are attached hereto as Exhibit "B."

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 118 and deny said allegations.**

119.    The three funeral homes that were vandalized are all located within approximately

twelve miles of each other.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 119 and deny said allegations.**

120.    There are more than a dozen funeral homes not owned by Plaintiff in the same

twelve-mile radius of the three Plaintiff-owned funeral homes that were vandalized. A map

showing the locations of all funeral homes within the vicinity of the three funeral homes that were vandalized on July 10, 2011, delineating between those funeral homes owned by Plaintiff and those that are not is attached hereto as Exhibit "C."

**ANSWER:    Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 120 and deny said allegations.**

121.    The vandalism of only those Chicago area funeral homes owned by Plaintiff, within days of Coli Sr.'s deposition, is directly related to the Cypress Funeral Home Lawsuit.

**ANSWER:    Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 121 and deny said allegations.**

122.    The Defendants caused the property destruction at the three Plaintiff-owned funeral homes. The Defendants were sending a message to Plaintiff that Plaintiff had better pay into the Funds and not call Coli Sr. as a witness at trial.

**ANSWER:    Defendants deny the allegations contained in Paragraph 122.**

123.    By maliciously damaging Plaintiffs property, the Defendants were engaging in witness tampering in an attempt to insulate themselves from further involvement as witnesses in the Cypress Funeral Home Lawsuit and as a warning to Plaintiff to capitulate and pay the amounts demanded. See 18 U.S.C. § 1512(b).

**ANSWER:    Defendants deny the allegations contained in Paragraph 123.**

124.    By destroying Plaintiff's property, the Defendants were obstructing justice by attempting to insulate themselves from further involvement as witnesses in the Cypress Funeral Home Lawsuit and as a warning to Plaintiff to capitulate and pay the amounts demanded. See 18 U.S.C. § 1503.

**ANSWER: Defendants deny the allegations contained in Paragraph 124.**

125.    These acts were in furtherance of the scheme to defraud Plaintiff as set forth above.

**ANSWER:** **Defendants deny they engaged in a scheme to defraud and deny the allegations contained in Paragraph 125.**

## The Prior Auditing Schemes

126.    The B&K audit which lead to the Cypress Funeral Home Lawsuit was only the most recent scheme perpetrated by Defendants to fraudulently extort additional monies from Plaintiff above and beyond that which Plaintiff was legally obligated to contribute.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 126.**

127.    Prior to the B&K audit, payroll audits were conducted on behalf of the Funds for each funeral home separately.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 127.**

128.    A previous round of payroll audits took place between in or about 2002 and 2005.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 128 and deny said allegations.**

129.    As with the B&K scheme, during that round of payroll audits, Defendant Bill Coli monitored and controlled the entire audit procedure in his capacity as Fund Administrator.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 129.**

130.    As with the B&K scheme, the status of the audit procedure during the first round of audits was regularly reported to the Board of Trustees for the Funds, including, to Trustee, Defendant Coli Sr.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 130 and deny said allegations.**

## The Montclair - Luciana Scheme

131.    In or around August 2002, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Thomas Havey to perform a payroll audit of Montclair - Luciana Funeral Home ("Montclair"), a funeral home owned by Plaintiff.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 131.**

132.     Shortly after being retained by Bill Coli to perform a payroll audit of Montclair, Thomas Havey sent a letter to Montclair, notifying it that the Funds had authorized a payroll audit of Montclair, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 132.**

133.     After receiving the aforementioned letter from Thomas Havey notifying it that the Funds had authorized a payroll audit of Montclair, Plaintiff cooperated with Thomas Havey by regularly meeting with Thomas Havey representatives and providing thorough and detailed payroll records and information relating to Plaintiffs employees.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 133 and deny said allegations.**

134.     The payroll audit of Montclair covered the period from July 1, 1992 to June 30, 2002.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 134.**

135.     On or around December 30, 2002, Thomas Havey sent the final audit report for Montclair to the Trustees of the Funds.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 135.**

136.     As with the B&K final audit report, the Montclair final audit report contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 136.**

137.     Examples of the false representations within the Montclair final audit report known by Defendants to be false were: (i) including amounts allegedly owed on behalf of individuals who were not performing covered work for which contributions were required to be

made and/or for whom all required contributions had been made; (ii) including amounts that were subject to prior settlement agreements between Plaintiff and the Union; (iii) including amounts on behalf of individuals who did not work at Montclair; and (iv) including funeral homes that were located out-of-state and, thus, beyond the scope of the audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 137.**

138.    Soon after receiving the Montclair final audit report from Thomas Havey, Defendant Bill Coli sent the Montclair audit report containing the numerous errors and improper inclusion of individuals and locations to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office must hear from Plaintiff within approximately two weeks, "in order for [Plaintiff] to avoid unnecessary expenses and litigation."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 138.**

139.    Defendants knew that the Montclair audit contained false information.

**ANSWER:** **Defendants deny the allegations in Paragraph 139.**

140.    The total amount of purported exceptions to employer contributions contained in the Montclair audit and demanded by Defendant Bill Coli on behalf of the Funds was for $122,332.97, which included claimed liquidated damages, interest and audit fees. Defendants believed Plaintiff would simply pay that amount instead devoting resources and funds to defending its legal rights.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 140.**

141.    A portion of the $122,332.97 demanded by Defendant Bill Coli on behalf of the Funds related to out-of-state funeral homes that were beyond the scope of the audit and

individuals who: (i) were not performing covered work for which contributions were required to be made and/or for whom all required contributions had been made; (ii) were subject to prior settlement agreements between Plaintiff and the Union; or (iii) did not work at Montclair.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 141.**

142. Plaintiff immediately notified Defendant Bill Coli of the improper demand for contributions involving individuals (i) who were not performing covered work for which contributions were required to be made and/or for whom all required contributions had been made, (ii) were subject to prior settlement agreements between Plaintiff and the Union and/or (iii) did not work at Montclair.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 142.**

143. In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the Montclair audit were proper, despite their knowledge to the contrary.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 143.**

144. On September 30, 2003, at the direction of Defendants, the Funds filed a lawsuit against SCI, captioned Thomas J. Moriarty, Trustee on behalf of the Teamsters Local Union No. 727 Pension Fund, et al. v. SCI Illinois Services, Inc. d/b/a Montclair Funeral Home, Docket number 03C-6907, in the United States District Court for the Northern District of Illinois ("the Montclair Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 144.**

145. At the time the Funds filed the Montclair Lawsuit, Defendants knew that amounts sought by the Montclair audit were not in fact due and owing to the Funds.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 145.**

146.     After the Montclair Lawsuit was filed, Plaintiff continued to provide Thomas Havey and the Funds with documentation establishing that certain elements of the Montclair audit were materially flawed.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 146 and deny said allegations.**

147.     On or about April 28, 2004, Plaintiff and the Funds entered into a settlement agreement related to the Montclair Lawsuit in the amount of $90,000, which was more than was actually owing but which was made for the purpose of avoiding further litigation expenses.

**ANSWER:     Defendants deny the allegations contained in Paragraph 147.**

### The Lloyd Mandel Levayah Scheme

148.     In or around September 2002, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Thomas Havey to perform a payroll audit of Lloyd Mandel Levayah ("Lloyd Mandel"), a funeral home owned by Plaintiff.

**ANSWER:     Defendants deny the allegations contained in Paragraph 148.**

149.     Shortly after being retained by Bill Coli to perform a payroll audit of Lloyd Mandel, Thomas Havey sent a letter to Lloyd Mandel, notifying it that the Funds had authorized a payroll audit of Lloyd Mandel, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:     Defendants deny the allegations contained in Paragraph 149.**

150.     After receiving the aforementioned letter from Thomas Havey notifying it that the Funds had authorized a payroll audit of Lloyd Mandel, Plaintiff cooperated with Thomas Havey by regularly meeting with Thomas Havey representatives and providing thorough and detailed payroll records and information relating to Plaintiffs employees.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 150 and deny said allegations.**

151. The payroll audit of Lloyd Mandel covered the period from July 1, 1992 to June 30, 2002.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 151.**

152. On or around December 30, 2002, Thomas Havey sent its final audit report for Lloyd Mandel to the Trustees of the Funds.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 152.**

153. The Lloyd Mandel final audit report contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 153.**

154. Examples of the false representations within the Lloyd Mandel final audit report known by Defendants to be false were: (i) including amounts allegedly owed on behalf of individuals who were not performing covered work for which contributions were required to be made; (ii) over-inflating amounts relating to livery removals; and (iii) including amounts relating to individuals for whom Plaintiff had made all required contributions through a different location.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 154.**

155. Soon after receiving the Lloyd Mandel final audit report from Thomas Havey, Bill Coli sent the Lloyd Mandel audit report containing the numerous errors and improper inclusion of individuals and locations to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office

must hear from Plaintiff within approximately two weeks "in order for [SCI] to avoid unnecessary expenses and litigation."

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 155.**

156.    Defendants knew that the Lloyd Mandel audit contained false information.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 156.**

157.    The total amount of purported exceptions to employer contributions contained in the Montclair audit and demanded by Defendant Bill Coli on behalf of the Funds was for $73,063.20, which included claimed liquidated damages, interest and audit fees. Defendants believed that Plaintiff would simply pay that amount instead devoting resources and funds to defending its legal rights.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 157.**

158.    An overwhelming majority of the $73,063.20 demanded by Bill Coli on behalf of the Funds was based upon over-inflated figures relating to livery trips and/or related to individuals who were not performing covered work for which contributions were required to be made or for whom Plaintiff had made all required contributions through a different location.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 158.**

159.    Without the improper claims for contributions contained within the final audit, the deficiencies within the Lloyd Mandel audit would have only totaled, at most, $5,910.00, including interest and audit fees.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 159.**

160.    Plaintiff immediately notified Defendant Bill Coli of the overly-inflated figures relating to livery trips and the improper demand for contributions involving individuals who

were not performing covered work for which contributions were required to be made or for whom all required contributions had been made through a separate location.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 160.**

161.     In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the Lloyd Mandel audit were proper, despite their knowledge to the contrary.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 161.**

162.     On November 26, 2003, at the direction of Defendants, the Funds filed a lawsuit against Plaintiff, captioned <u>Thomas J. Moriarty, Trustee on behalf of the Teamsters Local Union No. 727 Pension Fund, et al. v. SCI Illinois Services, Inc. d/b/a  Lloyd Mandel Levavah Funerals</u>, Docket number 03C-8634, in the United States District Court for the Northern District of Illinois ("the Lloyd Mandel Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 162.**

163.     At the time the Funds filed the Lloyd Mandel Lawsuit, Defendants knew that amounts sought by the Lloyd Mandel audit were not in fact due and owing to the Funds.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 163.**

164.     After the Lloyd Mandel Lawsuit was filed, Plaintiff continued to provide Thomas Havey and the Funds with documentation establishing that portions of the Lloyd Mandel audit were materially flawed.

**ANSWER:**     **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 164 and deny said allegations.**

165.     On February 15, 2005, Plaintiff, to avoid the expenses relating to continued litigation, capitulated and settled the Lloyd Mandel Lawsuit as part of a global settlement

involving audits for multiple SCI locations, paying more than was owed in the interest of avoiding litigation expense.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 165.**

**The Marsh Funeral Home Scheme**

166.     In or around October 2002, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Thomas Havey to perform a payroll audit of Marsh Funeral Home ("Marsh"), a funeral home owned by Plaintiff.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 166.**

167.     Shortly after being retained by Bill Coli to perform a payroll audit of Marsh, Thomas Havey sent a letter to Marsh, notifying it that the Funds had authorized a payroll audit of Marsh, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 167.**

168.     The payroll audit of Marsh covered the period from November 20, 1997 to June 30, 2002.

**ANSWER:**     **Defendants admit the allegations contained in Paragraph 168.**

169.     After receiving the aforementioned letter from Thomas Havey notifying it that the Funds had authorized a payroll audit of Marsh, Plaintiff cooperated with Thomas Havey by regularly meeting with Thomas Havey representatives and providing thorough and detailed payroll records and information relating to Plaintiffs employees.

**ANSWER:**     **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 169 and deny said allegations.**

170.     On or around December 30, 2002, Thomas Havey sent its final audit report for Marsh to the Trustees of the Funds.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 170.**

171.     As with the B&K final audit report, the final audit report for Marsh contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 171.**

172.     Examples of the false representations within the Marsh final audit report known by Defendants to be false were: (i) the inclusion of individuals who were not Union members at the time of the audit period; (ii) including amounts that had been settled pursuant to prior settlement agreements between Plaintiff and the Union; and (iii) including funeral homes that were located out-of-state and, thus, beyond the scope of the audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 172.**

173.     On February 18 2003, Bill Coli sent the Marsh audit report containing numerous errors and improper inclusion of individuals and locations to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office must hear from Plaintiff by February 28, 2003, "in order for [SCI] to avoid unnecessary expenses and litigation."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 173.**

174.     Defendants knew that the Marsh audit contained false information.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 174.**

175.     The total amount of purported exceptions to employer contributions contained in the Marsh audit and demanded by Defendant Bill Coli on behalf of the Funds was $72,173.38, which included claimed liquidated damages, interest and audit fees. Defendants intended that

Plaintiff would simply pay that amount instead of devoting resources and funds to defending its legal rights.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 175.**

176. The overwhelming majority of the $72,173.38 demanded by Defendants was for alleged deficiencies involving individuals who were not Union members at the time of the audit period or who were subject to prior settlement agreements between Plaintiff and the Union and for out-of-state funeral homes that were beyond the scope of the audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 176.**

177. Without the improper claims for contributions contained within the final audit, the deficiencies within the Marsh audit would have only totaled, at most, $540.00, including interest and audit fees.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 177.**

178. Plaintiff immediately notified Defendant Bill Coli of the improper demand for contributions involving: (i) individuals who were not union members at the time of the audit period; (ii) individuals who were subject to prior settlement agreements between Plaintiff and the Union; and (iii) out-of-state funeral homes.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 178.**

179. In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the Marsh audit were proper, despite their knowledge to the contrary.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 179.**

180. On September 30, 2003, at the direction of Defendants, the Funds filed a lawsuit against SCI, captioned <u>Thomas J. Moriarty, Trustee on behalf of the Teamsters Local Union No.</u>

727 Pension Fund, et al. v. SCI Illinois Services. Inc. d/b/a Marsh  Funeral Home, Docket number 03C-6909, in the United States District Court for the Northern District of Illinois ("the Marsh Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 180.**

181.    At the time the Funds filed the Marsh Lawsuit, Defendants knew that amounts sought by the Marsh audit were not in fact due and owing to the Funds.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 181.**

182.    After the Marsh Lawsuit was filed, Plaintiff continued to provide Thomas Havey and the Funds with documentation establishing that certain elements of the Marsh audit were materially flawed.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 182 and deny said allegations.**

183.    Eventually, after expending considerable legal fees in defense of the frivolous lawsuit brought on behalf of the Funds, on or about March 2, 2005, Plaintiff and the Funds entered into a settlement agreement related to the Marsh Lawsuit in the amount of $470.00.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 183 and deny said allegations.**

**The Columbian Chapels Scheme**

184.    In or around June 2003, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Legacy to perform a payroll audit of Columbian Chapels, Inc. ("Columbian Chapels"), a funeral home owned by Plaintiff.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 184.**

185.    Shortly after being retained by Bill Coli to perform a payroll audit of Columbian Chapels, Legacy sent a letter to Columbian Chapels, notifying it that the Funds had authorized a

payroll audit of Columbian Chapels, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 185.**

186. The payroll audit of Columbian Chapels covered the period from July 1, 1993 to June 30, 2003.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 186.**

187. After receiving the aforementioned letter from Legacy notifying it that the Funds had authorized a payroll audit of Columbian Chapels, Plaintiff cooperated with Legacy by regularly meeting with Legacy representatives and providing thorough and detailed payroll records and information relating to Plaintiffs employees.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 187 and deny said allegations.**

188. On or around February 10, 2004, Legacy sent its final audit report for Columbian Chapels to the Trustees of the Funds.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 188.**

189. As with the B&K final audit report, the Columbian Chapels final audit report contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 189.**

190. Defendants intentionally included numerous alleged deficiencies on behalf of an individual who did not even work at Columbian Chapels during the time period covered by the audit.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 190.**

191. Soon after receiving the Columbian Chapels final audit report from Legacy, Bill Coli sent the Columbian Chapels audit report containing the improper inclusion of an individual

who did not even work at Columbian Chapels during the time period covered by the audit to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office must hear from Plaintiff within approximately two weeks, "in order for [SCI] to avoid unnecessary expenses and litigation."

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 191.**

192.     Defendants knew that the Columbian Chapels audit contained false information.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 192.**

193.     The total amount of purported exceptions to employer contributions contained in the Columbian Chapels audit and demanded by Defendants on behalf of the Funds was for $9,466.00, which included claimed liquidated damages, interest and audit fees. Defendants believed that Plaintiff would simply pay that amount instead devoting resources and funds to defending its legal rights.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 193.**

194.     The overwhelming majority of the $9,466.00 demanded by Bill Coli on behalf of the Funds were for alleged deficiencies on behalf of an individual who did not work at Columbian Chapel during the time period covered by the audit.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 194.**

195.     Without the improper claims for contributions contained within the final audit, the deficiencies within the Columbian Chapel audit would have only totaled, at most, $103.01, including interest and audit fees.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 195.**

196.     Plaintiff immediately notified Defendant Bill Coli of the improper demand for contributions within the Columbian Chapel audit, including the amounts sought relating to an individual who did not work at Columbian Chapel during the time period covered by the audit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 196.**

197.     In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the Columbian Chapel audit were proper, despite their knowledge to the contrary.

**ANSWER:     Defendants deny the allegations contained in Paragraph 197.**

198.     On December 22, 2003, more than five weeks prior to Legacy sending the final audit report to the Trustees of the Funds, Defendants filed a lawsuit against SCI, captioned Thomas J. Moriarty, Trustee on behalf of the Teamsters Local Union No. 727 Pension Fund, et al. v. SCI Illinois Services, Inc. d/b/a Columbian Chapels, Inc., Docket number 03C-9208, in the United States District Court for the Northern District of Illinois ("the Columbian Chapels Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:     Defendants deny the allegations contained in Paragraph 198.**

199.     At the time the Funds filed the Columbian Chapels Lawsuit, Defendants knew that amounts sought by the Columbian Chapels audit were not in fact due and owing to the Funds.

**ANSWER:     Defendants deny the allegations contained in Paragraph 199.**

200.     After the Columbian Chapels Lawsuit was filed, Plaintiff continued to provide Legacy and the Funds with documentation establishing that certain elements of the Columbian Chapels audit were materially flawed.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 200 and deny said allegations.**

201.    On February 15, 2005, Plaintiff and the Funds settled the Columbian Chapels

Lawsuit as part of a global settlement involving audits for multiple SCI locations, paying more

than was owed in the interest of avoiding further litigation expense.

**ANSWER:    Defendants lack sufficient knowledge or information to enable them to admit
or deny the allegations contained in Paragraph 201 and deny said allegations.**

### The William H. Scott Funeral Home Scheme

202.    In or around July 2003, Defendant Bill Coli, acting in his capacity as Fund

Administrator, retained Legacy to perform a payroll audit of William H. Scott Funeral Home

("WHS"), a funeral home owned by Plaintiff.

**ANSWER:    Defendants deny the allegations contained in Paragraph 202.**

203.    Shortly after being retained by Bill Coli to perform a payroll audit of WHS,

Legacy sent a letter to WHS, notifying it that the Funds had authorized a payroll audit of WHS,

as a contributing employer to the Funds, "to verify the correctness of payments made to the

Funds."

**ANSWER:    Defendants deny the allegations contained in Paragraph 203.**

204.    The payroll audit of WHS covered the period from January 1, 1993 to December

31, 2002.

**ANSWER:    Defendants admit the allegations contained in Paragraph 204.**

205.    After receiving the aforementioned letter from Legacy notifying it that the Funds

had authorized a payroll audit of WHS, Plaintiff cooperated with Legacy by regularly meeting

with Legacy representatives and providing thorough and detailed payroll records and information

relating to Plaintiffs employees.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 205 and, on that basis, deny said allegations.**

206.     On or around February 16, 2004, Legacy sent its final audit report for WHS to the Trustees of the Funds.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 206.**

207.     As with the B&K final audit report, the WHS final audit report contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 207.**

208.     Examples of the false representations within the WHS final audit report known by Defendants to be false were: (i) including amounts on behalf of an individual for periods of time after the individual had been terminated and was no longer employed by Plaintiff; (ii) over-inflating amounts relating to livery removals; (iii) including amounts that were subject to prior settlement agreements between Plaintiff and the Union; and (iv) including funeral homes that were outside of the market covered by the applicable collective bargaining agreement.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 208.**

209.     Soon after receiving the WHS final audit report from Legacy, Bill Coli sent the WHS audit report containing the numerous errors and improper inclusion of individuals and locations to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office must hear from SCI within approximately two weeks, "in order for [Plaintiff] to avoid unnecessary expenses and litigation."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 209.**

210.     Defendants knew that the WHS audit contained false information.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 210.**

211.    The total amount of purported exceptions to employer contributions contained in the WHS audit and demanded by Defendants was for $58,698.60, which included claimed liquidated damages, interest and audit fees. Defendants believed that Plaintiff would simply pay that amount instead devoting resources and funds to defending its legal rights.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 211.**

212.    A substantial majority of the $58,383.54 demanded by Defendants on behalf of the Funds was based upon over-inflated figures relating to livery trips, the inclusion of an individual for dates when the individual no longer worked for Plaintiff and locations that were outside of the market covered by the applicable collective bargaining agreement or were subject to a prior settlement agreement between Plaintiff and the Union.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 212.**

213.    Without the improper claims for contributions contained within the final audit, the deficiencies within the WHS audit would have only totaled, at most, $16,623.69, including interest and audit fees.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 213.**

214.    Plaintiff immediately notified Defendant Bill Coli of the vastly overly-inflated figures relating to livery trips, the inclusion of an individual for time-periods after the individual was no longer employed by Plaintiff and the improper demand for contributions involving locations that were outside of the applicable market and/or subject to prior settlement agreements between Plaintiff and the Union.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 214.**

215. In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the WHS audit were proper, despite their knowledge to the contrary.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 215.**

216. On September 30, 2003, more than four months prior to Legacy sending the final audit report to the Trustees of the Funds, at the direction of Defendants, the Funds filed a lawsuit against SCI, captioned Thomas J. Moriarty, Trustee on behalf of the Teamsters Local Union No. 727 Pension Fund, et al. v. SCI Illinois Services. Inc. d/b/a William H. Scott Funeral Home, Docket number 03C-6911, in the United States District Court for the Northern District of Illinois ("the WHS Lawsuit") relating to the alleged audit delinquencies.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 216.**

217. At the time the Funds filed the WHS Lawsuit, Defendants knew that certain amounts sought by the WHS audit were not in fact due and owing to the Funds.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 217.**

218. After the WHS Lawsuit was filed, Plaintiff continued to provide Legacy and the Funds with documentation establishing that certain elements of the WHS audit were materially flawed.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 218 and deny said allegations.**

219. On February 15, 2005, Plaintiff and the Funds settled the WHS Lawsuit as part of a global settlement involving audits for multiple SCI locations, paying more than was owed in the interest of avoiding further litigation expense.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 219 and deny said allegations.**

**The Kenny Brothers Scheme**

220.     In or around December 2003, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Legacy to perform a payroll audit of Kenny Brothers Funeral Home ("Kenny Brothers"), a funeral home owned by Plaintiff.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 220.**

221.     Shortly after being retained by Bill Coli to perform a payroll audit of Kenny Brothers, Legacy sent a letter to Kenny Brothers, notifying it that the Funds had authorized a payroll audit of Kenny Brothers, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 221.**

222.     The payroll audit of Kenny Brothers covered the period from June 15, 1995 to September 30, 2003.

**ANSWER:**     **Defendants admit the allegations contained in Paragraph 222.**

223.     After receiving the aforementioned letter from Legacy notifying it that the Funds had authorized a payroll audit of Kenny Brothers, Plaintiff cooperated with Legacy by regularly meeting with Legacy representatives and providing thorough and detailed payroll records and information relating to Plaintiffs employees.

**ANSWER:**     **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 223 and deny said allegations.**

224.     On or around May 3, 2004, Legacy sent its final audit report for Kenny Brothers to the Trustees of the Funds.

**ANSWER:**     **Defendants admit the allegations contained in Paragraph 224.**

225.     As with the B&K final audit report, the Kenny Brothers final audit report contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 225.**

226. The false representations within the Kenny Brothers final audit report that were known by Defendants to be false involved the inclusion of overly-inflated amounts for alleged deficiencies relating to livery trips.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 226.**

227. Soon after receiving the Kenny Brothers final audit report, Bill Coli sent the Kenny Brothers audit report containing the numerous errors and improper inclusion of overly-inflated amounts relating to livery trips to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli went on to state that the Fund Office must hear from Plaintiff within approximately two weeks, "in order for [SCI] to avoid unnecessary expenses and litigation."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 227.**

228. Defendants knew that the Kenny Brothers audit contained false information.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 228.**

229. The total amount of purported exceptions to employer contributions contained in the Kenny Brothers audit and demanded by Defendants on behalf of the Funds was for $20,486.78, which included claimed liquidated damages, interest and audit fees. Defendants believed that Plaintiff would simply pay that amount instead devoting resources and funds to defend its legal rights.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 229.**

230. The overwhelming majority of the $20,486.78 demanded by Defendants on behalf of the Funds were based upon overly-inflated amounts relating to livery trips.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 230.**

231.    Without the improper claims for contributions contained within the final audit, the deficiencies within the Kenny Brothers audit would have only totaled, at most, $4,954.24, including interest and audit fees.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 231.**

232.    Plaintiff immediately notified Defendant Bill Coli of the vastly overly-inflated figures relating to livery trips contained in the Kenny Brothers audit report.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 232.**

233.    In an effort to extort additional monies from Plaintiff, Defendants continued to contend that the amounts contained in the Kenny Brothers audit were proper, despite their knowledge to the contrary.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 233.**

234.    On February 15, 2005, Plaintiff and the Funds settled the issues relating to the Kenny Brothers audit as part of a global settlement involving audits for multiple SCI locations, paying more than was owed in the interest of avoiding further litigation costs.

**ANSWER:**     **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 234 and deny said allegations.**

### The Piser Auto Livery Scheme

235.    In or around April 2005, Defendant Bill Coli, acting in his capacity as Fund Administrator, retained Legacy to perform a payroll audit of Piser Auto Livery ("Piser Livery").

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 235.**

236.    On April 6, 2005, Legacy sent a letter to Piser Livery, notifying it that the Funds had authorized a payroll audit of Piser Livery, as a contributing employer to the Funds, "to verify the correctness of payments made to the Funds."

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 236 and deny said allegations.**

237. Piser Livery is owned by Plaintiff and first came into existence in September 2003.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 237 and deny said allegations.**

238. Knowing that Piser Livery did not exist prior to September 2003, the April 5, 2005 letter stated that a representative of Legacy would be making an appointment to examine Piser Livery's records from the period October 1, 2003 to April 13, 2005.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 238 and deny said allegations.**

239. Sometime between April 6, 2005 and April 29, 2005, Legacy was directed by Defendants to expand the scope of its payroll audit of Piser Livery to the period March 16, 1995 to December 31, 2004.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 239.**

240. On April 29, 2005, Legacy sent its final audit report for Piser Livery to the Funds.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 240.**

241. As with the B&K final audit report, the final audit report for Piser Livery contained numerous false representations, which were known by Defendants to be false.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 241.**

242. As with the B&K final audit report, on May 13, 2005, Bill Coli sent the Piser Livery audit report containing numerous errors and improper inclusion of individuals to Plaintiff and told Plaintiff to contact the Fund Office "to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees." Defendant Bill Coli

went on to state that the Fund Office must hear from Plaintiff by May 25, 2005, "in order for [SCI] to avoid unnecessary expenses and litigation."

**ANSWER:** **Defendants deny the allegations contained in Paragraph 242.**

243. Defendants knew that the Piser Livery audit contained false information.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 243.**

244. The total amount of purported exceptions to employer contributions contained in the Piser Livery audit and demanded by Defendants on behalf of the Funds was for $15,974.96. Defendants believed that Plaintiff would simply pay that amount instead devoting resources and funds to defending its legal rights.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 244.**

245. The overwhelming majority of the $15,974.96 demanded by Bill Coli on behalf of the Funds were for alleged deficiencies prior to September 2003.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 245.**

246. Piser Livery did not exist prior to September 2003.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 246 and deny said allegations.**

247. Before September 2003, all employees of Piser Livery were employed by another, previously audited location and any claims relating to their work were resolved by settlements entered into for previously audited locations.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 247 and deny said allegations.**

248. Without the improper claims for contributions prior to September 2003, the deficiencies within the Piser Livery audit would have only totaled $91.60.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 248.**

249.     Plaintiff immediately notified Defendant Bill Coli of the improper demand for contributions pre-dating Piser Livery's existence for employees who had already been covered by settlements relating to audits of other locations.

**ANSWER:     Defendants deny the allegations contained in Paragraph 249.**

250.     In an effort to extort additional monies from SCI, Defendants continued to contend that the amounts contained in the Piser Livery audit were proper, despite their knowledge to the contrary.

**ANSWER:     Defendants deny the allegations contained in Paragraph 250.**

251.     On October 14, 2005, Thomas J. Moriarity, as Trustee of the Funds, entered into a Tolling Agreement with Plaintiff relating to the amounts alleged by the Funds to be due by Plaintiff, doing business as, Piser Auto Livery.

**ANSWER:     Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 251 and deny said allegations.**

252.     On May 21, 2007, at the direction of Defendants, the Funds filed a lawsuit against SCI, captioned <u>Teamsters Local Union No. 727 Health and Welfare Fund, et al.  v. SCI Illinois Services, Inc., an Illinois Corporation, individually and d/b/a Piser Auto  Livery and d/b/a Lamb Auto Livery</u>, Docket number 07C-2822, in the United States District Court for the Northern District of Illinois ("the Piser Livery Lawsuit") relating to the alleged audit delinquencies in the Piser Livery audit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 252.**

253.     At the time the Funds filed the Piser Livery Lawsuit, Defendants knew that the amounts sought by the Piser Livery audit were not in fact due and owing to the Funds.

**ANSWER:     Defendants deny the allegations contained in Paragraph 253.**

254. After the Piser Livery Lawsuit was filed, Plaintiff continued to provide Legacy and the Funds with documentation establishing that elements of the Piser Livery audit were materially flawed.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 254 and deny said allegations.**

255. Eventually, after expending considerable legal fees in defense of the frivolous lawsuit brought on behalf of the Funds, on or about April 30, 2008, Plaintiff and the Funds entered into a settlement agreement related to the Piser Livery Lawsuit as part of a global settlement involving audits for multiple locations, paying more than was owed in the interest of avoiding further litigation costs.

**ANSWER:** **Defendants lack sufficient knowledge or information to enable them to admit or deny the allegations contained in Paragraph 255 and deny said allegations.**

## COUNT I

### Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1962(c)

**SCI Illinois Services, Inc.**
**vs.**
**John T. Coli, Sr., William Coli, John T. Coli, Jr., Teamsters Local 727, John and Jane Does 1 through 100, John and Jane Doe Corporations 1 through 10 and Other John Doe Entities 1 through 10**

256. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

**ANSWER:** **Defendants incorporate by reference their answers to the preceding paragraphs.**

257. At all relevant times, John Coli, Sr., Bill Coli, John Coli, Jr., Teamsters Local 727, John and Jane Does 1 through 100, John and Jane Doe Corporations 1 through 10 and Other John Doe Entities 1 through 10 were "persons" as defined by 18 U.S.C. § 1961(1)

**ANSWER:** **Defendants deny the allegations contained in Paragraph 257.**

258.     At all relevant times, the Funds were "enterprises" engaged in, or whose activities affected and affect interstate commerce as defined by 18 U.S.C. § 1961(4).

**ANSWER:     Defendants neither admit nor deny the allegations contained in paragraph 258 because the allegation is a legal conclusion for which no answer is required.  To the extent a response is required, the Defendants deny the allegations contained in Paragraph 258.**

259.     Collectively, the Funds comprise an "association in fact" and an "enterprise" whose activities affected interstate commerce.

**ANSWER:     Defendants neither admit nor deny the allegations contained in paragraph 259 because the allegation is a legal conclusion for which no answer is required.  To the extent a response is required, the Defendants deny the allegations contained in Paragraph 259.**

260.     At all relevant times, the Defendants were associated with the Funds.

**ANSWER:     Defendants deny the allegations contained in Paragraph 260.**

261.     In violation of 18 U.S.C. § 1962(c), the Defendants conducted and participated, directly and indirectly, in the affairs of the Funds through a pattern of racketeering activity.

**ANSWER:     Defendants deny the allegations contained in Paragraph 261.**

262.     The Defendants conducted the affairs of the Funds through a "pattern of racketeering activity" consisting of numerous predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, witness tampering under 18 U.S.C. § 1512(b), obstruction of justice under 18 U.S.C. § 1503 and unlawful influence regarding the operations of an employee benefit plan under 18 U.S.C. § 1954.

**ANSWER:     Defendants deny the allegations contained in Paragraph 262.**

263.     In violation of 18 U.S.C. § 1341, in furtherance of the aforementioned scheme to defraud and intimidate, the Defendants knowingly caused to be sent and received matter through the United States Postal Service.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 263.**

264.    In violation of 18 U.S.C. § 1341, in furtherance of the aforementioned scheme to defraud and intimidate, the Defendants knowingly caused to be sent and received matter through private and commercial interstate carriers.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 264.**

265.    In violation of 18 U.S.C. § 1343, in furtherance of the aforementioned scheme to defraud and intimidate, the Defendants knowingly transmitted and caused to be transmitted writings, facsimiles, emails and oral communications by means of wire communication.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 265.**

266.    The Defendants foresaw or reasonably should have foreseen the use by others of the United States mail, interstate telephone calls, electronic mail and wires, and interstate private commercial delivery carriers as a result of the aforementioned scheme to defraud and intimidate.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 266.**

267.    The mailings and wires in furtherance of the scheme to defraud and intimidate Plaintiff include the following:

a.    In or around August 2002, Thomas Havey used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Montclair;

b.    In or around September 2002, Thomas Havey used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Lloyd Mandel;

c.    In or around October 2002, Thomas Havey used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Marsh;

d.   On or around December 30, 2002, Thomas Havey used the U.S. mail to send its final audit report for Montclair to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

e.   On or around December 30, 2002, Thomas Havey used the U.S. mail to send its final audit report for Lloyd Mandel to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

f.   On or around December 30, 2002, Thomas Havey used the U.S. mail to send its final audit report for Marsh to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

g.   In or around January or February 2003, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Montclair to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the Montclair final audit report;

h.   In or around January or February 2003, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Lloyd Mandel to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the Lloyd Mandel final audit report;

i.   On February 18, 2003, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Marsh to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the Marsh final audit report within ten days;

j.   In or around June 2003, Legacy used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Colombian Chapels;

k.   In or around July 2003, Legacy used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of WHS;

l.   In or around December 2003, Legacy used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Kenny Brothers;

m.   On or around February 10, 2004, Legacy used the U.S. mail to send its final audit report for Columbian Chapels to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

n.   On or around February 16, 2004, Legacy used the U.S. mail to send its final audit report for WHS to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

o.   In or around March 2004, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Columbian Chapels to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the Columbian Chapels final audit report;

p.   In or around March 2004, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for WHS to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the WHS final audit report;

q.   On or around May 3, 2004, Legacy used the U.S. mail to send its final audit report for Kenny Brothers to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

r.   In or around May or June 2004, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Kenny Brothers to Plaintiff and requested

payment from Plaintiff of the delinquent contributions set forth in the Kenny Brothers final audit report;

     s.   On April 6, 2005, Legacy used the U.S. mail to send a letter to Plaintiff, advising Plaintiff that the Local 727 Funds had authorized a payroll audit of Piser Livery;

     t.   On April 29, 2005, Legacy used the U.S. mail to send its final audit report for Piser Livery to the Board of Trustees for the Funds, which included numerous representations known by Defendants to be false;

     u.   On May 13, 2005, Defendant Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report for Piser Livery to Plaintiff and requested payment from Plaintiff of the delinquent contributions set forth in the Piser Livery final audit report within approximately two weeks;

     v.   On July 12, 2007, B&K used the U.S mail to send a letter to Plaintiff, advising Plaintiff that it was selected for a field payroll audit and requesting records from Plaintiff in connection with the B&K audit;

     w.   On April 22, 2008, B&K used the U.S. mail to send a copy of their preliminary audit report to Plaintiff and Defendant Bill Coli;

     x.   On May 5, 2008, B&K used the U.S. mail to send a letter to Bill Coli contending that it was unable to complete its audit because it had not received all of the necessary payroll records from Plaintiff and requesting the Funds' assistance in obtaining same;

     y.   On March 30, 2009, B&K used the U.S. mail to send its final audit report to the Board of Trustees for the Funds, which included numerous individuals known by the Defendants to have been improperly included in the final audit;

z.   On April 2, 2009, Bill Coli used the U.S. mail to send the fraudulent and misleading final audit report to David Klein of SCI and requested payment from Plaintiff of the delinquent contributions set forth in the final audit;

aa.  On June 2, 2009, Attorney Greenberg used the U.S. Mail to send a letter to Plaintiff requesting payment for alleged "audit delinquencies, liquidated damages, interest and auditing costs in the amount of $528,522.16" and advising that legal action against Plaintiff would be instituted unless payment of the aforementioned amount was made in full within ten days;

bb. On September 22, 2009, Bill Coli used the U.S. Mail to send a letter to David Klein of SCI contending that Plaintiff needed to send B&K additional payroll records in order to confirm that non-bargaining unit employees were not included in the final audit report;

cc.  On December 16, 2009, Tom Marino, a payroll audit supervisor with B&K ("Marino"), used the U.S. mail to send a letter to counsel for Plaintiff requesting additional information for various individuals for the alleged purpose of determining whether the individuals should be included or excluded from the audit;

dd. On March 25, 2010, Bill Coli sent an email to David Klein, with a carbon copy sent interstate to counsel for Plaintiff, concerning reaching a settlement of the materially flawed audit and the Cypress Funeral Home Lawsuit;

ee.  On March 31, 2010, Bill Coli sent another email to David Klein, with an interstate carbon copy to counsel for Plaintiff, stating that upon the recommendation of Attorney Greenberg, the Board of Trustees, including John Coli, Sr., John Coli, Jr. and Joseph Coli, would not agree to dismiss the Cypress Funeral Home Lawsuit, and stating that Plaintiff needed to provide B&K with the additional information that they were requesting;

ff. On April 8, 2010, Marino sent an interstate email to counsel for Plaintiff needlessly requesting documentation for all SCI employees detailed on Illinois unemployment quarterly reports;

gg. On April 15, 2010, Marino used the U.S. mail to send a letter to Steve Metzger, counsel to SCI ("Metzger"), with a carbon copy to Bill Coli and Attorney Greenberg, stating that the additional information provided to B&K by Plaintiff, including a detailed spreadsheet of SCI employees that work within the area covered by the CBA, was "not adequate" for B&K to proceed with its review of the final audit and, again, needlessly requesting documentation for all SCI employees detailed on Illinois unemployment quarterly reports;

hh. On April 30, 2010, Marino used the U.S. mail to send a letter to Metzger, with a carbon copy to Bill Coli, Attorney Greenberg and Gary Pater, stating that as a result of Plaintiff not providing sufficiently detailed records to B&K, B&K was referring the matter back to the Funds' legal counsel and, that, unless Plaintiff provided B&K with all of the documents requested, "we see no need for any further communication regarding this matter";

ii. On May 4, 2010, Bill Coli sent an interstate email to Metzger stating that he would forward to B&K a copy of Plaintiffs August 10, 2009 letter to Bill Coli identifying the numerous errors contained in the B&K audit, for B&K's "consideration and action";

jj. On May 12, 2010, B&K used the U.S. mail to send a revised audit report to Plaintiff along with a cover letter demanding additional information regarding disputed individuals who were still named in the report despite not being Union members and/or not performing any bargaining work during the time period of the audit;

kk. On May 14, 2010, John Coli, Jr. sent an interstate email to Joseph Hayes, counsel for SCI ("Hayes"), John Coli, Sr. and Bill Coli stating that the Coli Defendants would pass along

information to B&K and confirm with B&K previous settlement agreements but that the Coli Defendants were powerless to control what information "goes in or out of the [B&K audit] report";

ll.   On May 14, 2010, Pater sent an interstate email to Metzger, with a carbon copy to Bill Coli, attaching the revised final audit report, deducting approximately $37,000 in alleged deficiencies related to certain individuals and locations that were subject to prior settlement agreements between Plaintiff and Local 727;

mm.      On May 17, 2010, Pater sent an interstate email to Metzger, with a carbon copy to Bill Coli, stating that it would be helpful if SCI would create a document detailing the job descriptions of the employees remaining in question in the revised final audit report and the individuals identified in B&K's review of the Illinois unemployment quarterly tax returns, and attaching a spreadsheet containing a list of hundreds of employees for whom B&K was requesting detailed job description information;

nn. After Metzger responded to Pater that, although Plaintiff could provide even more detailed job descriptions for each employee at issue, it would be too onerous of a task to draft job descriptions for every one of Plaintiffs employees over a five-year period, Pater sent another interstate email to Metzger on May 17, 2010 simply stating, "I'm sorry to hear that. We still need that information as it is essential to the completion of our audit.";

oo. On July 6, 2010, John Coli, Jr. sent an interstate email to Joseph Hayes, noting that his father, John Coli, Sr., had informed him that Mr. Hayes would like to discuss the B&K audit with the Trustees for the fund and offering July 14, 2010 as a possible date for such a meeting;

pp. On July 21, 2010, Pater used the U.S. mails to send a letter to Metzger, with a carbon copy to Bill Coli, stating, for the first time, that the seven employees remaining in question within the B&K revised final audit would not be removed from the audit unless Plaintiff provided documentation indicating that Plaintiff met certain obligations referenced in the CBA;

qq. Moreover, on July 21, 2010, Pater used the U.S. mails to send a letter to Bill Coli suggesting that B&K was unable to complete the audit because Plaintiff had failed to provide certain information;

rr.  On September 7, 2010, Pater used the U.S. mails to send a letter to Metzger stating that the additional documentation provided by Plaintiff to B&K did not support any further revisions to the final revised audit report;

ss.  On February 28, 2011, Attorney Greenberg sent an interstate facsimile to Metzger stating that Rose Lamb would not be removed from the second revised final audit report and stating that John Coli Sr. and Bill Coli had no knowledge of any agreement between Local 727 and Plaintiff regarding Ms. Lamb being exempted from participation in the Funds;

tt.  Any and all pleadings, documents and correspondence, including but not limited to the underlying complaints, served upon Plaintiff and/or counsel for Plaintiff in the Cypress Funeral Home Lawsuit, the Montclair Lawsuit, the Lloyd Mandel Lawsuit, the Marsh Lawsuit, the Columbian Chapels Lawsuit, the WHS Lawsuit and the Piser Livery Lawsuit via the U.S. mail and/or electronically served upon individuals and/or counsel located outside of Illinois through the court's ECF system; and

uu. All other acts of mail fraud, wire fraud and/or other RICO predicate acts as discovery may reveal.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 267, including each subparagraph thereof.**

268.     Each and every act of vandalism of Plaintiff's funeral homes by Defendants on the night of July 10, 2011 constitutes a separate predicate act of witness tampering in violation of 18 U.S.C. § 1512(b) insofar as each act of vandalism was an attempt by Defendants to intimidate or corruptly persuade Plaintiff from calling Defendant John Coli, Sr. as a witness at trial in the Cypress Funeral Home Lawsuit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 268.**

269.     Each and every act of vandalism of Plaintiffs funeral homes by Defendants on the night of July 10, 2011 constitutes a separate predicate act of obstruction of justice in violation of 18 U.S.C. § 1503(a), insofar as Defendants endeavored to obstruct or impede the due administration of justice by corruptly persuading Plaintiffs to not call Defendant John Coli, Sr. as a witness at trial in the Cypress Funeral Home Lawsuit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 269.**

270.     Defendants' deliberate failure to disclose to Plaintiff or the Court that Ben Affetto had met with Chris Balodimas during the pendency of the Cypress Funeral Home Lawsuit and that Balodimas had advised Affetto that he did not perform bargaining unit work during the time period covering the B&K audit constitutes a predicate act of obstruction of justice in violation of 18 U.S.C. § 1503(a), insofar as Defendants corruptly endeavored to influence or obstruct the due administration of justice in the context of the Cypress Funeral Home Lawsuit.

**ANSWER:     Defendants deny the allegations contained in Paragraph 270.**

271.     The Defendants' receipt of additional monies and/or agreement to receive additional monies in the Local 727 Funds by engaging in the aforementioned scheme to defraud Plaintiffs and wrongfully extort from Plaintiffs money and contributions that the Funds are not

entitled to constitutes a predicate act of unlawful influence regarding the operations of an employee benefit plan in violation of 18 U.S.C. § 1954.

**ANSWER:** **Defendants deny the allegations contained in paragraph 271.**

272. The Defendants' violation of Section 1962(c) proximately and directly caused injury to Plaintiffs business and property.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 272.**

273. The injury to SCI's business and property includes, but is not limited to, SCI's out of pocket and incurred expenses in connection with defending against the Cypress Funeral Home Lawsuit, the Montclair Lawsuit, the Lloyd Mandel Lawsuit, the Marsh Lawsuit, the Columbian Chapels Lawsuit, the WHS Lawsuit and the Piser Livery Lawsuit as well as the costs to repair its vandalized funeral homes and costs of responding to frivolous requests for documents and analysis, including but not limited to outside counsel and in-house attorneys, paralegals and employees of Plaintiff.

**ANSWER:** **Defendants deny the allegations contained in paragraph 273.**

274. As the scheme and conspiracy are continuing, Plaintiff requests an injunction ordering Defendants to conduct the Funds' audits fairly and in good faith and only when required by proper cause.

**ANSWER:** **Defendants deny the allegations contained in paragraph 274.**

## COUNT II

### Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1962(d)

**SCI Illinois Services, Inc.**
**vs.**
**John T. Coli, Sr., William Coli, John T. Coli, Jr., Teamsters Local 727, John and Jane Does 1 through 100, John and Jane Doe Corporations 1 through 10 and Other John Doe Entities 1 through 10**

275.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

**ANSWER:**    **Defendants incorporate by reference their answers to the preceding paragraphs.**

276.    At all relevant times, John Coli, Sr., Bill Coli, John Coli, Jr., Teamsters Local 727, John and Jane Does 1 through 100, John and Jane Doe Corporations 1 through 10 and Other John Doe Entities 1 through 10 were "persons" as defined by 18 U.S.C. § 1961(1)

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 276.**

277.    From approximately 2002 to the present date, Local 727, John Coli, Sr., Bill Coli, John Coli, Jr. and the John Doe Defendants violated 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of the Funds through a pattern of racketeering activity.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 277.**

278.    Overt acts in furtherance of the conspiracy include but are not limited to the mailings, wires and actions described in paragraphs 267 through 271 above, and all other acts of mail fraud, wire fraud and/or other RICO predicate acts as discovery may reveal.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 278.**

279.    The violation of Section 1962(d) proximately and directly caused injury to SCI's business and property.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 279.**

280.    The injury to SCI's business and property includes, but is not limited to, SCI's out of pocket and incurred expenses in connection with defending against the Cypress Funeral Home Lawsuit, the Montclair Lawsuit, the Lloyd Mandel Lawsuit, the Marsh Lawsuit, the Columbian Chapels Lawsuit, the WHS Lawsuit and the Piser Livery Lawsuit as well as the costs to repair its vandalized funeral homes.

**ANSWER:** **Defendants deny the allegations contained in paragraph 280.**

281.     In the alternative, Local 727 aided and abetted the Coli Defendants and the John Doe Defendants in conducting the affairs of the Funds through a pattern of racketeering activity.

**ANSWER:** **Defendants deny the allegations contained in paragraph 281.**

282.     As the scheme and conspiracy are continuing, Plaintiff requests an injunction ordering Defendants to conduct the Funds' audits fairly and in good faith and only when required by proper cause.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 282.**

## AFFIRMATIVE DEFENSES

As and for their affirmative defenses, the Defendants assert and state as follows:

## FIRST AFFIRMATIVE DEFENSE

The Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.  Based on the Plaintiff's allegations, it is apparent Plaintiff discovered the alleged harm in 2002 and 2003 when the first separate funeral home audits took place, including Montclair-Luciana, Lloyd Mandel Levayah, Marsh Funeral Home, Columbian Chapels, William H. Scott Funeral Home, and Kenny Brothers.  Complaint ¶¶ 131-147, 148-165, 166-183, 184-201, 202-219, 220-234.  Plaintiff averred that the Defendants' alleged scheme began in 2002 and that Plaintiff knowingly submitted to the Defendants' extortion until it decided to fight back in approximately 2009.  Complaint ¶¶ 25, 32.  Accordingly, since Plaintiff discovered the alleged injury in 2003, at the latest, Plaintiff's complaint is time barred by the four year statute of limitations for RICO actions.

## SECOND AFFIRMATIVE DEFENSE

The Plaintiff's claims are barred by the doctrine of unclean hands.  Plaintiff refused to submit payroll documents during the audit procedure, which led to inaccurate audit results.  The Funds were required to seek court intervention after Plaintiff continually refused to cooperate with audit procedures.  Plaintiff's own actions, and not Defendants' actions, led Plaintiff to incur unnecessary attorney's fees in defending lawsuits in addition to interest and liquidated damages.  Consequently, Plaintiff's claims are barred.

## THIRD AFFIRMATIVE DEFENSE

The Plaintiff failed to join indispensable and necessary parties, i.e. the auditors.  Plaintiff alleged conduct by the auditors, Bansley & Kiener, LLP, Thomas Havey, and Legacy, and by the Funds yet failed to name them as parties.  Plaintiff alleged the auditors were co-conspirators in the alleged racketeering activity.  Complaint, ¶¶52-107, 131-147, 148-165, 166-183, 184-201, 202-219, 220-234, 235-254, 267.  It is not possible for the Defendants to adequately defend against the allegations without all necessary parties.

WHEREFORE, Defendants request the Court dismiss the Plaintiff's Complaint with prejudice and enter an order against Plaintiff for Defendants' attorney fees and costs and all such other relief as Defendants prove themselves entitled.

Respectfully Submitted,

/s/  Marvin Gittler

/s/  Heidi B. Parker

Marvin Gittler, ARDC #00965472
mg@ulaw.com
Heidi B. Parker, ARDC #06290413
hbp@ulaw.com
Asher, Gittler & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois 60606
Ph. (312) 263-1500
Fax (312) 263-1520